UNITED STATES of America,
Plaintiff-Appellant,

v.

Roy MANDUJANO, Defendant-
Appellee.

No. 73–3353.

United States Court of Appeals,
Fifth Circuit.

June 28, 1974.

Rehearing and Rehearing En Banc
Denied Oct. 16, 1974.

See also, 5 Cir., 496 F.2d 1059.

William Sessions, U. S. Atty., John Pinckney, III, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellant.

Michael Allen Peters, Houston, Tex. (Court-appointed), for defendant-appellee.

Before TUTTLE, COLEMAN and AINSWORTH, Circuit Judges.

TUTTLE, Circuit Judge:

On May 2, 1973, appellee Mandujano appeared as a witness before the DALE (Drug Abuse Law Enforcement) Grand Jury, pursuant to a subpoena. The following warnings were given Mandujano:

"Q: Now you are required to answer all the questions that I ask you except for the ones that you feel would tend to incriminate you. Do you understand that?

A: Do I answer all the questions you ask.

Q: You have to answer all the questions except for those you think will incriminate you in the commission of a crime. Is that clear?

A: Yes, sir.

Q: You don't have to answer questions which would incriminate you. All other questions you have to answer openly and truthfully. And, of course, if you do not answer those truthfully, in other words, if you lie about certain questions, you could possibly be charged with perjury?"

Mandujano was further advised that he could have an attorney outside the grand jury room; however, he was not told that he had a right to have appointed counsel outside the grand jury room,

that what he said could be used against him in later proceedings, and that he had a right to remain silent.[1]

A federal narcotics agent had reported that in March, 1973, he offered Mandujano money for the purchase of heroin and gave him $650 for the attempted purchase. The government attorney who questioned Mandujano before the grand jury testified at the motion to suppress that he had discussed with the agent the circumstances of this attempted buy in preparation for Mandujano's appearance before the grand jury. Evidence taken on the motion to suppress also showed that the government attorney requested suggestions for witnesses to be supoenaed before the grand jury from the agent who had dealt with Mandujano and the agent recommended calling Mandujano and then reported to the attorney how the actual attempt had occurred.

Mandujano was asked the following questions, *inter alia,* by the government attorney before the grand jury:

"Q: Have you ever talked with anybody about selling it? Has anybody tried to buy heroin from you? Have you tried to get heroin for them in order to sell to them?

A: No, sir.

Q: Are you sure of that?

A: Yes, sir.

Q: In other words, no one has ever come up to you and wanted to buy heroin?

A: No, sir.

Q: Well, if you would like to have a lawyer, he cannot be inside this room. He can only be outside. You would be free to consult with him if you so chose. Now, if during the course of this investigation, the questions that we ask you, if you feel like you would like to have a lawyer outside to talk to, let me know.

A: Yes, sir.

Q: Is that clear?

A: (Nod affirmative)."

---

1. Actually Mandujano told the government attorney that he didn't have the money to get a lawyer. The following conversation transpired between them:

"Q: Have you discussed your presence here with anybody?

A: My wife.

Q: Have you contacted a lawyer in this matter?

A: No, sir, I haven't.

Q: I take that to mean then that you do not wish the services of a lawyer here today?

A: I don't have one. I don't have the money to get one.

At no time was Mandujano told that an attorney would be furnished him free of charge if he were financially unable to employ one.

Q: And you have never told anybody that you would try to get heroin to sell to them?

A: No, sir.

Q: Now, you can say here today that you have not discussed the sale of heroin with anybody in the last year?

A: I don't understand you, sir.

Q: Have you talked to anybody about selling heroin to them during the last year?

A: No, sir.

Q: Are you sure about that?

A: I just, you know, I discuss it, you know, when we buy it, you know, to fix it just, you know.

Q: Has anyone ever asked you if they could buy an ounce of heroin or more from you?

A: No, sir.

Q: Let me ask you once again Mr. Mandujano, have you ever talked to anybody about selling them heroin in the last year?

A: No, sir.

Q: No one has ever given you any money—

A: No.

Q: —to go buy them heroin?

A: No, sir.

Q: In other words, if you had $650 right now—

A: Yes, sir.

Q: —Do you think you would be able to purchase an ounce of heroin? . . ."

This interrogation tracked the exact facts of the actual contact between the federal narcotics agent and Mandujano.

The appellee was subsequently indicted in count 1 under 21 U.S.C.A. § 846 for attempt to distribute one ounce of heroin on or about the 29th of March, 1973, and in count 2 under 18 U.S.C.A. § 1623 for making false representations. The perjury count was based on Mandujano's denial before the grand jury of any attempt to obtain or sell heroin or any solicitation to do so.

The district court granted appellee's motion to suppress his testimony before the grand jury, finding that appellee was a virtual or putative defendant in custody under the *Miranda*[2] decision, and therefore should have been given all *Miranda* warnings. United States v. Mandujano, 365 F.Supp. 155 (W.D.Tex. 1973). The district court determined that the warnings given were inadequate and that appellee could not be deemed to have voluntarily waived his Fifth Amendment right to remain silent. Appellee was convicted under count 1 for attempt to distribute heroin, *without* use of his grand jury testimony.

## I. "PUTATIVE OR VIRTUAL" DEFENDANT

■ Given the nature of the investigation and the questions tendered by the government attorney, the district court held, and this Court agrees, that full *Miranda* warnings should have been accorded Mandujano who was in the position of a virtual or putative defendant. The district court aptly portrayed the circumstances warranting the fact finding that Mandujano was a virtual or putative defendant during his appearance before the grand jury:

"The government maintains that neither case was considered for presentation to the grand jury prior to the testimony of the defendants before that body, and that both files had been closed following the contact between the defendants and the law enforcement officers; nevertheless, the facts of the case belie the government's protestations of innocent intent with respect to the possibility of future prosecutions. The special attorney who had conducted the questioning testified that he was well aware of the previous contact with the defendants in attempts to buy from them, as well as the exact circumstances involved in each attempted

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965).

buy. The transcript of the grand jury proceedings reveals deliberate and careful attention to questions which specifically delved into the facts concerning these contacts between the defendant and government agents. The special attorney was aware that no case had been made, and though this Court does not presume any improper motives on the part of the government agents or the special attorney, it strains credulity to suggest that the special attorney did not have one eye on a possible prosecution of the defendants. The government had in fact already attempted to make a case against each defendant. Note too that each defendant, immediately after denying any contact about an attempted sale, was asked in the very next question about the validity of that answer . . . Considering the totality of the circumstances in this case, the questioning of the defendants before the grand jury smacks of entrapment. Moreover, given the fact that the investigatory files involving the attempts to buy from both defendants had been closed, the questions posed presented a high likelihood that the answers provided by the defendants would furnish material for further action on the part of the government. If the defendants admitted that they had offer to buy heroin for the undercover agent who approached them, the government could possibly have used such an admission in its case-in-chief in connection with the attempted sale. See United States v. Leighton, 265 F. Supp. 27 (S.D.N.Y.1967), cert. denied, 390 U.S. 1025, 88 S.Ct. 1412, 20 L.Ed. 2d 282 (1968); United States v. Montos, 421 F.2d 215 (5th Cir.), cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). The denial by defendants that they had conversations about procuring heroin for the officers left them open to the consequent indictments for perjury. Actually, therefore, their only safe harbor would have been to remain silent, and this option was, in effect, denied to them." United States v. Mandujano, 365 F.Supp. at 158–159 (W.D. Tex.1973).[3]

We construe the foregoing statements by the trial court to be findings that the government had focused upon Mandujano as someone whom the government had knowledge of having committed a crime, as a person whom the government had planned to indict as it had one eye on prosecution, and against whom it was gathering incriminating evidence. Also the discussion indicates that the trial court found that when Mandujano was brought into the grand jury room, the government then knew that an affirmative answer to questions put to him would amount to a confession of guilt of trafficking in heroin.

Although this Court has recently pretermitted the question of the scope of *Miranda* in the context of a putative defendant before a grand jury investigation, United States v. Morado, 454 F.2d 167 (5th Cir. 1972) and Mattox v. Carson, 424 F.2d 202 (5th Cir. 1970), cert. denied, 400 U.S. 822, 91 S.Ct. 43, 27 L. Ed.2d 51 (1971), we have recognized that as a general rule a grand jury witness is not entitled to warnings of his right to appointed counsel and his right to remain silent.[4] The Court of Appeals for the Sixth Circuit, however, has carved out the exception that when a person ceases to be merely a witness in a general investigation and becomes placed "virtually in the position of a de-

---

3. The reference to "defendants" is made in the plural because the district court issued a joint opinion for this case and United States v. Rangel, 365 F.Supp. 155 (W.D.Tex.1973), because it found that the two cases, though not consolidated and not involving the same transaction, embodied a virtually identical set of circumstances.

4. *Morado, supra* at 173. Robinson v. United States, 401 F.2d 248 (9th Cir. 1968); United States v. DiMichele, 375 F.2d 959 (3rd Cir. 1967); United States v. Winter, 348 F. 2d 204 (2d Cir. 1965); United States v. Parker, 244 F.2d 943 (7th Cir. 1957); United States v. Scully, 225 F.2d 113, 116 (2d Cir. 1955).

fendant," then the full panoply of rights under *Miranda* due a person in custody must be afforded. *See* United States v. Luxenberg, 374 F.2d 241 (6th Cir. 1967); United States v. Fruchtman, 282 F.Supp. 534 (N.D.Ohio 1968), cert. denied, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed. 2d 86 (1970); Stanley v. United States, 245 F.2d 427 (6th Cir. 1957).[5]

In United States v. Morado, *supra* at 173, we have already recognized the force of the argument that if an investigation has passed beyond the stage of a general inquiry and has focused upon the defendant, then the defendant would be in the position of a virtual defendant:

> "Without intimating whether this circuit will agree with this 'virtual defendant' perspective, we note that its emphasis is upon the same factor we have considered to be of prime importance in determining whether or not a man is 'in custody' as that term is used in *Miranda*: 'has the focus of the investigation centered upon him?' United States v. Phelps, 443 F.2d 246 (5th Cir. 1971); United States v. Akin, 435 F.2d 1011 (5th Cir. 1970); United States v. Montos, 421 F.2d 215 (5th Cir. 1970); Bendelow v. United States, 418 F.2d 42 (5th Cir. 1969); Windsor v. United States, 389 F.2d 530 (5th Cir. 1968). If the investigation in the case at bar had passed beyond the stage of being a general inquiry into an unsolved crime of a suspected conspiracy, and had focused upon Solis as a defendant whom the government planned to indict and against whom it was gathering incriminating evidence, we would face the necessity of embracing or rejecting this rule."

The language in *Morado* is particularly applicable in the case at bar because this investigation clearly had passed beyond the stage of general inquiry into an unsolved crime, and had focused upon the defendant as someone whom the government had planned to indict as it had one eye on prosecution, against whom it was gathering incriminating evidence, and against whom indictments were actually returned.[6] The fact that the questioning attorney immediately pounced upon Mandujano's denial that he had been contacted about the sale of heroin, indicated a clear and direct focus upon Mandujano as a future defendant. Moreover, the government attorney even mentioned the precise figure—$650—which had purportedly been given to Mandujano by the federal narcotics agent, plainly demonstrating that the previous transaction was clearly in the attorney's mind.

Also there was no basis for the perjury count of the indictment until after Mandujano's grand jury appearance.

---

5. In United States v. Fruchtman, *supra*, in circumstances similar to the instant case, the court found the witness to be a virtual defendant. There the government attorney submitted an affidavit denying that the witness was a potential defendant at the time of questioning; yet, the court noted that this attorney had also read investigative reports detailing the circumstances about which the witness was questioned before the grand jury. These facts are similar to those here, where the special government attorney read the narcotics agent's report prior to the grand jury session.

6. This Court in Brown v. Beto, 468 F.2d 1284, 1286 (5th Cir. 1972), discussed at length the application of *Miranda*, stating: "Before law enforcement officers can subject a citizen to custodial interrogation, he must first have been given the *Miranda* warnings. In *Miranda* 'custodial interrogation' was defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'[4] This court has yet to formulate a general rule for distinguishing custodial from non-custodial interrogation but instead has preferred to take a case-by-case approach.[5] . . . In making the distinction between custodial and non-custodial interrogation this court has singled out certain criteria as having special significance; these include probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation.[7] Although none of these factors is alone determinative, we have recently indicated that the most compelling is whether or not the focus of the investigation has finally centered on the defendant.[8]"

When the government attorney, aware of the alleged prior transaction, asked Mandujano about any previous heroin solicitation or sale, he knew that any truthful answer by Mandujano would be incriminating and therefore protected by the Fifth Amendment which Mandujano was entitled to plead. Thus, if the attorney proceeded to question actually anticipating an answer, he must have known that the response would require Mandujano to confess to a crime or commit perjury. The likelihood of Mandujano confessing a crime before the grand jury was certainly de minimis. The inference is easily drawn that the attorney's questioning was primarily baiting Mandujano to commit perjury. As perceived by the district court this case "smacks" of entrapping Mandujano to incriminate himself or commit perjury. His only "safe harbor" was to remain silent—a right of which the government failed to inform him.

The government asserts that since Mandujano negotiated for a heroin sale with the federal narcotics agent which did not result in a distribution due to appellee's being unable to procure heroin from his sources, therefore the government agents concluded that appellee must have had knowledge of a source for heroin. Consequently he was called before the grand jury only to obtain intelligence regarding known heroin sources, consistent with the purposes of the grand jury, and not in an attempt to obtain incriminating or perjurous statements from him. Nevertheless, as concluded by the district court, "the facts of the case belie the government's protestations of innocent intent with respect to the possibility of future prosecution." Moreover, the questions tendered by the government attorney simply could have inquired whether Mandujano knew any heroin dealers rather than focusing on whether anyone had ever solicited heroin from him.

Moreover, the warnings that were given were not adequate advisement even of the appellee's Fifth Amendment rights against self-incrimination. As pointed out by the trial court, the questioning attorney "stressed not the right to remain silent, but the requirement that the defendant answer all the questions put to him, with limited exceptions. He did not stress the alternative of the defendant remaining silent in the face of a potentially [here certainly] damaging question."

Under the circumstances of this case, this Court agrees that Mandujano was a putative defendant in custody and was entitled to *Miranda* warnings.

## II. REMEDY FOR FAILURE TO GIVE MIRANDA WARNINGS

The more difficult issue here is whether the usual remedy for failure to give constitutional warnings, i. e., suppression of the testimony, can ever be employed in a situation where the testimony itself amounted to perjury.

Appellant relies heavily on United States v. Orta, 253 F.2d 312 (5th Cir. 1958), to convince us that "[u]nder no circumstances" can a grand jury "witness" commit perjury and then successfully claim that the Constitution affords him protection from prosecution for that crime. Witness Orta was charged with having committed perjury at a grand jury investigation. The district court suppressed Orta's grand jury testimony, but this Court reversed, broadly stating, *supra* at 314:

"It is clear that the protection of the Fifth Amendment relates to crimes alleged to have been committed before the time when the testimony is sought. A *witness*, ignorant and uninformed of his constitutional rights, would not intelligently waive them if he testifies, thinking that he was compelled to do so. He might answer truthfully and thereafter assert the constitutional guaranty. *Under no circumstances, however, could he commit perjury and successfully claim that the Constitution afforded him protection from prosecution for that crime.* As said in Glickstein v. United States, 1911, 222 U.S. 139, 142, 32 S. Ct. 71, 73, 56 L.Ed. 128; '* * *

the immunity afforded by the constitutional guaranty relates to the past, and does not endow the person who testifies with a license to commit perjury.'

"The only debatable question is one of the supervision of the conduct of Government representatives in the interest of fairness. In United States v. Scully, 2 Cir., 1955, 225 F.2d 113, 116, the Court of Appeals for the Second Circuit held:

' * * * the mere possibility that the witness may later be indicted furnishes no basis for requiring that he be advised of his rights under the Fifth Amendment, when summoned to give testimony before a Grand Jury.'

"That holding is applicable to the present record. *There is no showing that the Grand Jury before which Orta testified was seeking to indict him or any other person already identified.*" (Emphasis supplied).

Although clearly holding that a mere "witness" uninformed of his rights before the grand jury, even one concerning whom there is a "mere possibility" of indictment, may not commit perjury with impunity, the *Orta* court sounded the important caveat that the question of supervision of the conduct of government representatives in the interest of fairness may be debatable in some circumstances. The language in the *Orta* opinion, *supra* at 314,

"There is no showing that the Grand Jury before which Orta testified was seeking to indict him or any other person already identified,"

highlights the important distinction between *Orta* and this case, demonstrating the wisdom of the caveat concerning the court's duty of supervision "in the interest of fairness." The instant case does not involve a mere "witness," but a putative, and subsequently actual, defend-

ant. The facts showed that there was a mere possibility that a witness may later be indicted, but that the government deliberately subpoenaed a putative defendant before the grand jury primarily for the purpose of obtaining incriminating or perjurous statements against him and mainly in order to elicit evidence helpful in indicting him. Several decisions of this Court, such as *Orta, Daniels, Glasco, Stassi* and *Wilcox*,[7] have involved perjurous testimony and the adequacy of the instruction as to constitutional rights; however, the precise issue of a putative defendant who was primarily called before the grand jury for the purpose of obtaining incriminating or perjurous statements and mainly in order to elicit evidence helpful in indicting him has not been presented to this Court. Although there are factually overlapping features of the cases to be discussed, we have concluded that the totality of circumstances in the case at bar calls clearly for this Court to affirm the district court's suppression of Mandujano's testimony before the grand jury.

■ As heinous as the crime of perjury is under our law, and as correct as the *Orta* principle is, that a witness uninformed of his constitutional rights generally should not be afforded a license to commit perjury, under our law, we simply cannot ignore the unfairness in baiting this defendant before the grand jury and overlook the principle that the Fifth Amendment must always be as broad as the mischief against which it seeks to guard. In order to deter the prosecuting officers from bringing a putative or virtual defendant before the grand jury, for the purpose of obtaining incriminating or perjurous testimony, the accused must ·be adequately apprised of his rights, or all of his testimony, incriminating and perjurous, will be suppressed. In order to combat these methods the Fifth Amend-

---

7. United States v. Orta, 253 F.2d 312 (5th Cir. 1958); United States v. Daniels, 461 F.2d 1076 (5th Cir. 1972); United States v. Glasco, 488 F.2d 1068 (5th Cir. 1974);

Stassi v. United States, 401 F.2d 259 (5th Cir. 1968); United States v. Wilcox, 450 F. 2d 1131 (5th Cir. 1971).

ment privilege must be fully honored in this situation. This end entails only slight erosion of the general principle announced in *Orta.* This deviation in the situation of a putative defendant uninformed of his *Miranda* rights and called for the purpose of obtaining incriminating or perjurous testimony is necessary to counteract the fundamental unfairness of allowing a defendant to be faced by such a Hobson's choice.

In distinguishing *Orta,* we distinguish the other cases, cited above rendered after the date of *Miranda,* which reaffirmed the *Orta* principle (pre-*Miranda*), as none of these decisions concerned the situation of a putative defendant entitled to, but unadvised of, his *Miranda* warnings. The problem here is the problem adverted to in the *dictum* in *Orta,* and not the problem *adjudicated* by the *Orta* holding or by any other decisions of this Court. As previously indicated, the grand jury was not seeking to indict Orta and Orta was not a putative defendant entitled to *Miranda* warnings. Orta was an ordinary witness entitled to a general Fifth Amendment warning.

The district court apparently determined that in view of the subsequent holding in *Miranda,* there was now an essential difference between a *prosecution* for perjury when there have been no *Miranda* warnings and the *suppression of testimony* under the exclusionary rule, when such warnings have not been given, i. e., that although the indictment could not have been dismissed, the testimony could nonetheless have been suppressed. This distinction would be a facile solution to the difficult question here, were it not for the language in United States v. Glasco, 488 F.2d 1068 (5th Cir. 1974), intervening between the district court's decision in the case at bar and the instant appeal, indicating that *Orta* had "post-*Miranda* vitality." In *Glasco* the defendant *witness,* who was in custody for another crime, had perjured himself when testifying in the trial of another defendant and the court held that a motion to suppress was prop-

erly denied. Again, however, *Glasco* concerned entirely different facts, and an entirely different procedure. Glasco was not put up as a witness to give evidence incriminating himself. He had already pleaded guilty to the same offense. Here, the agent reported that he believed Mandujano had committed the narcotics offense charged in court 1, and the government proceeded to subpoena Mandujano before the grand jury and asked him the precise questions dealing with a transaction that led to his being indicted by this same grand jury. Moreover, since Glasco appeared at a trial as a defense witness, he apparently appeared voluntarily and not by the compulsion of a subpoena issued on behalf of the government.

Furthermore, the two cases cited in *Glasco, Wilcox* and *Stassi,* also involved factual circumstances so dissimilar from those of the instant case that they need not be discussed. Both cases quoted from the *Orta* opinion.

One final case, United States v. Daniels, 461 F.2d 1076 (5th Cir. 1972), which was noted by the district court, discusses the applicability of *Orta* to persons who commit perjury before a grand jury. Grand jury witness Daniels signed a "Waiver of Privilege Against Self-Incrimination" which advised that a witness could consult with an attorney outside the grand jury room but contained no statement with respect to the appointment of counsel for indigent witnesses, and proceeded to give perjurous testimony to the grand jury. Daniels conceded that generally there is no right to counsel for ordinary witnesses appearing before the grand jury, but argued that when an indigent witness who is advised that he may have an attorney present, must also be advised that if he is unable to provide his own counsel, one will be appointed for him free of cost. Finding that Daniels was "only a witness" and "was not under indictment when he appeared," the court held that he was not entitled to appointed counsel. The important distinguishing factors are that Daniels did not

argue that he was entitled to *Miranda* warnings, but only contended that since a witness could have retained counsel, he should have been advised that indigent witnesses may have appointed counsel free of cost. Furthermore, the court clearly delineated that Daniels was only a witness and not a putative defendant. Therefore, the latter portion of the decision which concludes that Daniels, even if entitled to counsel and deemed not to have waived his rights, would still have no license to commit perjury is a reaffirmation of the general principle announced in *Orta* and is to be distinguished completely from the situation of a putative defendant entitled to *Miranda* warnings who is called before the grand jury for the purpose of obtaining incriminating or perjurous testimony.

■ We reiterate that the *Orta* principle that witnesses uninformed of their constitutional rights should not be allowed a license to commit perjury continues with full force. We only make a slight inroad that where a totally unfair procedure is put in train—as when there is a factual determination that a person who is subpoenaed before the grand jury and questioned about an alleged crime, was already known to the satisfaction of the prosecuting agency prior to the grand jury appearance to be guilty of that precise crime—, elemental fairness requires that such a person is under such compulsion as to require that he be given the *Miranda* warnings, and that failure to do so must require suppression of any incriminating testimony given by him even though he is being prosecuted for giving false testimony.

■ The remaining question arises from the principle that the Fifth Amendment protection against self-incrimination extends only to past acts, not to those that are or may be commit-

ted in the future. As stated in Glickstein v. United States, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1952), [quoted by the *Orta* court, as stated *infra*], " * * * the immunity afforded by the constitutional guaranty relates to the past, and does not endow the person who testifies with a license to commit perjury." The appellant urges that when the defendant Mandujano appeared before the grand jury, he had not committed the perjury and that his criminal liability concurred with his utterance before the grand jury. Therefore, the perjury indictment was not premised upon evidence of past acts obtained from the mouth of the defendant, but was based on a crime whose very commission, rather than evidence of commission, was the defendant's testimony. Glickstein v. United States, *supra*, concerned a bankrupt who was indicted for perjury for having falsely sworn in a bankruptcy proceeding while under examination before a referee.

Once again, we must point to the distinguishing characteristics in the facts and the *proceedings* in this case. The entire proceedings here which led up to Mandujano's indictment for perjury were, as we have noted repeatedly, beyond the *pale of permissible prosecutorial conduct*.[8] We conclude that the entire proceeding was a violation of Mandujano's due process rights under the Fifth Amendment.

We, of course, do not attempt an axiomatic definition of due process, but note the well known language from Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1941), overruled on other grounds, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1962):

"'Asserted denial [of due process] is to be tested by an appraisal of the to-

---

8. As did the trial court, we refrain from placing blame on any one official for what turned out to be conduct "smacking" of entrapment. We recognize the fact that involved here were an agent who reported to his superior, and then a special attorney having designated duties in the field of narcotics investigation and prosecution, and fi-

nally the United States Attorney and his staff. Somewhere within this chain of command and information, a decision was made to subpoena as a witness a man to whom the original agent testified he had given $650 for a "score," and to ask this witness about this specific transaction.

tality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.' "

Although the application of the standard set in Betts v. Brady, *supra,* was overruled in Gideon v. Wainwright, *supra,* it is clear that the test remains the same. Was the conduct (refusal to appoint counsel) so "offensive to the common and fundamental ideas of fairness" as to amount to a denial of due process. 316 U.S. at 473.

We conclude simply that the proceedings here complained of met that standard.

We believe this not to be inconsistent with any prior decision of this Court, all of which dealt only with the specific rights guaranteed by the self-incrimination clause of the Fifth Amendment.

The judgment is affirmed.